# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

PHYLLIS SCHULTZ,

       Plaintiff,

vs.

ABILITY INSURANCE COMPANY,
f/k/a MEDICO LIFE INSURANCE
COMPANY,

       Defendant.

No. C11-1020

ORDER

## TABLE OF CONTENTS

**I.**    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**II.**   **PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**III.**  **RELEVANT FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**IV.**  **DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    **A.**   *Motions to Strike* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        **1.**   *Affidavits of Dr. Salas and Dr. Shafer* . . . . . . . . . . . . . . . 5
            *a.*   *Were 26(a)(2)(B) Written Reports Required?* . . . . . . . 5
            *b.*   *Did the Expert Witness Disclosure Fairly Summarize*
                *the Testimony?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            *c.*   *What is the Appropriate Sanction for*
                *Noncompliance?* . . . . . . . . . . . . . . . . . . . . . . . . . . 10
        **2.**   *Statement of Additional Material Facts* . . . . . . . . . . . . . . 12
    **B.**   *Motion for Partial Summary Judgment* . . . . . . . . . . . . . . . . . . 13
        **1.**   *Does the Bad Faith Claim Fail as a Matter of Law?* . . . . . 13
            *a.*   *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
            *b.*   *Relevant Facts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
                *(1)*   *First Claim.* . . . . . . . . . . . . . . . . . . . . . . . . 17
                *(2)*   *Second Claim.* . . . . . . . . . . . . . . . . . . . . . . 19
                *(3)*   *Claims Processing* . . . . . . . . . . . . . . . . . . . . 20
            *c.*   *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

|  |  | (1) | *Loss of Functional Capacity* | 22 |
|  |  | (2) | *Cognitive Impairment* | 24 |
|  |  | (3) | *Medical Necessity* | 25 |
|  | *2.* | *Does the Fraud and Misrepresentation Claim Fail As a Matter of Law?* |  | 27 |
|  | *3.* | *May Schultz Recover Damages for Emotional Distress?* |  | 29 |
|  | *4.* | *May Schultz Recover Punitive Damages?* |  | 31 |
| *V.* | *ORDER* |  |  | 32 |

## I. INTRODUCTION

This matter comes before the Court on the Motion for Partial Summary Judgment (docket number 66) filed by Defendant Ability Insurance Company on August 14, 2012, the Response (docket number 78) filed by Plaintiff Phyllis Schultz on September 8, and the Reply (docket number 86) filed by Ability Insurance on September 21.

Also before the Court is the Motion to Strike Certain Testimony (docket number 85) filed by Ability Insurance on September 21, 2012, the Response (docket number 96) filed by Schultz on October 9, and the Reply (docket number 101) filed by Ability Insurance on October 19, 2012.

Also before the Court is the Motion to Strike Plaintiff's Statement of Additional Material Facts (docket number 88) filed by Ability Insurance on September 21, the Response (docket number 95) filed by Schultz on October 9, and the Reply (docket number 100) filed by Ability Insurance on October 19.

Ability Insurance's request for oral argument is denied. Pursuant to Local Rule 7.c, the issues will be decided without oral argument.

## II. PROCEDURAL HISTORY

On June 21, 2011, Schultz sued Ability Insurance following its refusal to pay benefits allegedly owed pursuant to a long-term care insurance policy. Schultz filed an amended complaint on December 19, 2011, although the allegations against Ability

Insurance remained unchanged.[1] Schultz states three claims for relief: breach of contract, bad faith, and fraud and misrepresentation. Schultz seeks compensatory damages, including emotional distress, and punitive damages. Trial is scheduled on January 24, 2013.

In its instant motion for partial summary judgment, Ability Insurance asks that Schultz's bad faith claim and fraud claim be dismissed. Ability Insurance also argues that Schultz's claims for emotional distress and punitive damages fail as a matter of law. Schultz asks that the motion be denied.

### III. RELEVANT FACTS

Plaintiff Phyllis Schultz, who is now 86 years old, purchased a long-term care insurance policy from Mutual Protective Life Insurance in 1999. Ability Insurance assumed the policy on August 14, 2009, although it effectively assumed responsibility for the policy on September 27, 2007.[2] On August 16, 2008, Schultz moved into the Dubuque Retirement Community. Ten days earlier – on August 6, 2008 – Schultz submitted a claim for benefits under the policy. The claim was denied on October 24, 2008. On April 9, 2009, Schultz submitted a second claim for benefits. The second claim was denied on or about August 12, 2009. At about that time, Schultz moved to Sunset Park, where she continues to reside.

---

[1] The amended complaint added four additional non-contracting defendants. The four additional defendants were dismissed, however, in an Order filed by the Court on October 9, 2012.

[2] Following the issuance of Schultz's policy, Mutual Protective Insurance Company changed its name to Medico Insurance Company. Medico Life Insurance Company, a wholly owned subsidiary of Medico Insurance Company, assumed responsibility for Schultz's policy. On September 27, 2007, Ability Resources, Inc. purchased 100% of the stock in Medico Life Insurance Company. In 2009, Medico Life Insurance Company changed its name to Ability Insurance. In any event, Ability Insurance concedes that it is the company responsible for the payment of any benefits owed pursuant to Schultz's policy.

To be eligible for benefits under the policy, Schultz must meet one of three "benefit qualifiers": medical necessity, loss of functional capacity, or cognitive impairment.[3] Obviously, the parties disagree regarding whether Schultz qualifies for benefits pursuant to the policy. Ability Insurance does *not* seek summary judgment on the breach of contract claim, apparently recognizing that there are genuine issues of fact which must be decided by the jury. Rather, Ability Insurance asks that the Court determine, as a matter of law, that it has not acted in bad faith and the evidence does not support a finding of fraud. Schultz argues that Ability Insurance had no reasonable basis to deny her claim, and that genuine issues of material fact exist regarding whether Ability Insurance acted fraudulently.

The parties have provided voluminous information regarding Schultz's condition, treatment, and the handling of her claim. While the Court has carefully reviewed the parties' respective statements of fact, the attachments thereto, and the responses, it will not attempt to describe the record in detail. Ability Insurance argues that, at the least, Schultz's claim was "fairly debatable," thus prohibiting a recovery for bad faith. Ability Insurance also argues that Schultz's fraud claim is "merely a repackaged breach of contract claim," and fails as a matter of law.[4] Additional relevant facts will be set forth below.

## IV. DISCUSSION

### A. Motions to Strike

Preliminarily, the Court must address the Motion to Strike Certain Testimony (docket number 85) and the Motion to Strike Plaintiff's Statement of Additional Material Facts (docket number 88), both filed by Ability Insurance on September 21, 2012. First, Ability Insurance asks the Court to strike, as undisclosed expert testimony, the affidavits of Dr. Hillard Salas and Dr. Roger D. Shafer. Second, Ability Insurance asks the Court

---

[3] *See* Long-Term Care Policy (docket number 85-4), Part H.

[4] Ability Insurance's Brief (docket number 66-1) at 15.

to strike the "inappropriate portions" of Schultz's additional statement of facts, as "irrelevant, argumentative, and/or unsupported."

### 1. Affidavits of Dr. Salas and Dr. Shafer

On March 19, 2012, Schultz timely served a designation of expert witnesses.[5] The designation identified one "retained expert," and identified Dr. Salas and Dr. Shafer as "treating physicians." According to the designation, the doctors were not specifically retained for purposes of litigation, but are "expected to have knowledge of facts and opinions within the scope of expert testimony under the Federal Rules." The designation then referred Ability Insurance generally to the "medical records and/or authorizations previously provided to Defendants."

A party must disclose the identity of any witness it may use at trial to present expert testimony. *See* FED. R. CIV. P. 26(a)(2)(A). If a witness is retained or specially employed to provide expert testimony in a case, then the disclosure must be accompanied by a written report containing specific information. *See* FED. R. CIV. P. 26(a)(2)(B)(i-vi). If a witness is *not* required to provide a written report (*i.e.*, was not retained or specially employed to provide expert testimony), then the disclosure must state the "subject matter" on which the witness is expected to testify and "a summary of the facts and opinions" to which the witness is expected to testify. *See* FED. R. CIV. P. 26(a)(2)(C). "This disclosure is considerably less extensive than the report required by Rule 26(a)(2)(B)." *See* Advisory Committee notes (2010). According to the Advisory Committee notes, "[f]requent examples [requiring only summary disclosure] include physicians or other health care professionals . . . ." *Id.*

### a. Were 26(a)(2)(B) Written Reports Required?

Ability Insurance first argues that the opinions contained in the doctors' affidavits go "far beyond the scope of their treatment," thereby effectively turning them into retained experts. Both Dr. Salas and Dr. Shafer state in their affidavits that it is "reasonably

---

[5] *See* docket number 85-5.

probable" that Schultz's condition would have been "adversely affected" if she had not received supervised care beginning in August 2008. Both doctors also opine that providing supervised care was "consistent with accepted medical standards" in treating persons with Schultz's conditions. Not coincidentally, in meeting the "medical necessity" alternative for qualifying for benefits, Schultz must prove that the care was "consistent with accepted medical standards for treating the diagnosed condition and could not have been omitted without adversely affecting your condition."[6]

The extent to which a treating physician may render expert testimony without preparing a written report has been a persistent question. The issue was ably described by Judge Walters in *Crabbs v. Wal-Mart Stores, Inc.*:

> Treating physicians are both fact witnesses and, by virtue of their education, training and experience, experts. In the ordinary course of treating and advising a patient they often must form opinions about the patient's medical condition and future needs. *Smith* [*v. Bankers Life and Cas. Co.*, 2008 WL 2845080 (S.D. Iowa 2008),] and *Griffith* [*v. Northeast Illinois Reg. Commuter R.R. Corp.*, 233 F.R.D. 513 (N.D. Ill. 2006),] are part of a line of cases which try to fix a point at which a treating physician who has not been retained or specially employed to give expert testimony should be treated as a retained expert for the purposes of the Rule 26(a)(2)(B) report requirement. That point usually comes when the physician's opinions are seen as exceeding the scope of treatment. The reasons for requiring a report for treating physician opinions seen as beyond the scope of treatment are to effectuate the purpose of the report requirement to give fair notice of opinion testimony and time for the opponent to prepare, and to recognize that as attorneys discuss the case with their injured client's doctor, the doctor may be asked to give opinions for the purpose of the litigation beyond those determined at the time of treatment. *See Meyers v. National R.R. Passenger Corp.*, 619 F.3d 729, 734–35 & n.3 (7th Cir. 2010).

---

[6] *See* Long-Term Care Policy (docket number 85-4), Part H.

It is sometimes difficult, however, to tell where the line should
be drawn. See 6 Moore's Federal Practice § 26.23[2][b][iii]
at 26-112 (3d ed. 2010). A per se rule excluding certain kinds
of opinions in the absence of a report sweeps too broadly.

2011 WL 499141 (S.D. Iowa) at *2.

In *Brooks v. Union Pacific R. Co.*, 620 F.3d 896 (8th Cir. 2010), the plaintiff did
not disclose any expert witnesses or provide any expert reports. In response to the
defendant's motion for summary judgment, however, the plaintiff provided an affidavit
from his treating physician. The Court first noted that "a treating physician may testify
as a lay witness when describing a medical *condition*," citing *Davoll v. Webb*, 194 F.3d
1116, 1139 (10th Cir. 1999). *Id.* at 900. The plaintiff did not seek to use his physician's
testimony merely to explain his condition, however, but also sought to use the physician
to explain *causation* of his condition. *Id.* The Court concluded that because the plaintiff
had failed to designate his physician as an expert witness, the doctor could not testify
regarding causation. *Id.* The Court did not address the issue, however, of whether a
treating physician who has been identified as an expert must submit a written report. It
should be noted that *Brooks* was decided prior to the amendment to Rule 26(a)(2) on
December 1, 2010.

In determining whether a written report is required, other circuits seem to draw a
distinction based on whether the expert opinions expressed by the physician were formed
during the course of his treatment, or came later as part of the litigation. *See, e.g.,*
*Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011)
("Today we join those circuits that have addressed the issue and hold that a treating
physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent
that his opinions were formed during the course of treatment."); *Meyers v. National R.R.*
*Passenger Corp. (Amtrak)*, 619 F.3d 729, 734-35 (7th Cir. 2010) ("[A] treating physician
who has offered to provide expert testimony as to the cause of the plaintiff's injury, but
who did not make that determination in the course of providing treatment, should be

deemed to be one 'retained or specially employed to provide expert testimony in the case,' and thus is required to submit an expert report in accordance with Rule 26(a)(2)."). Again, it should be noted that *Goodman* and *Meyers* were decided prior to the recent amendment to Rule 26(a)(2). A recent district court case, decided after the amendment to Rule 26(a)(2), concluded that a treating doctor could testify on non-treatment issues if the opinion was formed during the course of treatment, even if no written report was submitted. *Hair v. Federal Exp. Corp.*, 2012 WL 4846999 (E.D. Wash.) at *11 ("[A] treating physician may be allowed to opine even as to causation if there is sufficient evidence that the opinion was formed during the course of providing treatment, regardless of submission of an expert report.") (citing *Goodman*). *See also Mears v. Safeco Ins. Co. of Illinois*, 2012 WL 3744758 (D. Mont.); *Ghiorzi v. Whitewater Pools & Spas, Inc.*, 2011 WL 5190804 (D. Nev.).

Here, both Dr. Salas and Dr. Shafer are treating physicians. Their medical records and reports have been produced, and will not be detailed here. In their respective affidavits, the doctors state that providing supervised care is consistent with accepted medical standards in treating someone with Schultz's conditions. The doctors further opine that if Schultz had not begun receiving supervised care in August 2008, then her condition would have been adversely affected. Ability Insurance concedes that a treating physician may testify regarding a patient's diagnosis and treatment without submitting the written report required by Rule 26(a)(2)(B). It argues, however, that a treating physician may "morph" into a retained expert – thus triggering the need for a written report – when the physician's testimony goes "beyond the usual scope of a testifying doctor's testimony." As noted by Judge Walters in *Crabbs*, it is sometimes difficult "to tell where the line should be drawn."

Ability Insurance objects to two opinions expressed by the doctors in their affidavits. First, the doctors state that providing supervised care to someone with Schultz's conditions is consistent with accepted medical standards. The Court concludes that such

an opinion is reasonably related to a doctor's treatment of his patient, and does not transform the doctor into a retained expert. Second, Ability Insurance objects to the doctors testifying that if Schultz had not received supervised care, it would have adversely affected her condition. While this issue may be somewhat closer, the Court nonetheless concludes that the opinion is reasonably related to the doctors' treatment, and no Rule 26(a)(2)(B) written report is required.

### b. Did the Expert Witness Disclosure Fairly Summarize the Testimony?

In December 2010, Rule 26(a)(2) was amended to require the disclosure of opinions held by experts who are *not* required to provide a written report. When identifying experts who are not retained or specially employed to provide expert testimony, such as treating physicians, a party must state the "subject matter" on which the witness is expected to testify and "a summary of the facts and opinions" to which the witness is expected to testify. *See* FED. R. CIV. P. 26(a)(2)(C). Ability Insurance argues that even if Dr. Salas and Dr. Shafer are not required to submit written reports as retained experts, Schultz's expert witness disclosure nonetheless failed to comply with Rule 26(a)(2)(C).

Both the Rule 26(a)(2)(B) written report and the Rule 26(a)(2)(C) disclosure "share the goal of increasing efficiency and reducing unfair surprise." *Brown v. Providence Medical Center*, 2011 WL 4498824 (D. Neb.) at *1. Schultz's designation of expert witnesses simply states that the doctors "have knowledge of facts and opinions within the scope of expert testimony under the Federal Rules," and then refers to their respective medical records. While the disclosure required by Rule 26(a)(2)(C) is "considerably less extensive" than the report required by Rule 26(a)(2)(B), I believe the minimal disclosure provided by Schultz is noncompliant with the rule. *Id.* (rejecting the plaintiffs' argument that the medical records adequately provided the defendants with the subject matter, facts, and opinions of the treating physicians). *See also Pineda v. City and County of San Francisco*, 280 F.R.D. 517 (N.D. Cal. 2012). *Compare Kristensen v. Spotnitz*, 2011 WL 5320686 (W.D. Va.) (finding that a letter from the doctor recounting the facts,

diagnosis, and opinion regarding causation satisfied the disclosure requirement of Rule 26(a)(2)(C)). Schultz's reference to the medical records, without more, does not satisfy the disclosure requirement of Rule 26(a)(2)(C).

### c.    What is the Appropriate Sanction for Noncompliance?

As set forth above, I have concluded that Schultz's bare bones designation of Dr. Salas and Dr. Shafer as expert witnesses does not comply with the summary disclosure requirements of Rule 26(a)(2)(C). Accordingly, the Court must determine an appropriate sanction. Ability Insurance asks that the Court exclude the testimony of Dr. Salas and Dr. Shafer or, alternatively, that it be given an opportunity to redepose the witnesses, time to obtain a rebuttal expert, and costs.

If a party fails to provide information required by Rule 26(a)(2), then it may not use that information at a hearing or trial, unless the failure was substantially justified or is harmless. *See* FED. R. CIV. P. 37(c)(1). However, noncompliance with Rule 26(a) does not automatically lead to the exclusion of evidence. *Lopez v. Keeshan*, 2012 WL 2343415 (D. Neb.) at *4. When fashioning a remedy, the Court should consider, among other things, "the reason for noncompliance, the surprise and prejudice to the opposing party, the extent to which allowing the information or testimony would disrupt the order and efficiency of the trial, and the importance of the information or testimony." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008) (citing *Sellers v. Mineta*, 350 F.3d 706, 711-12 (8th Cir. 2003)). The Eighth Circuit Court of Appeals has noted that "the district court's discretion narrows as the severity of the sanction or remedy it elects increases." *Id.*

In her response to the instant motion, Schultz explains that her attorney "did not provide a separate summary because counsel believed reports were not required as to treating doctors, and because counsel knew Ability had statements and records from

Dr. Salas stating his view of the need for care."[7]  The Court notes that when the designation of expert witnesses was served by Schultz in March 2012, the new rule had been in effect for approximately 15 months and there were only a limited number of cases interpreting what is required by "a summary of the facts and opinions," as stated in Rule 26(a)(2)(C).  Regarding the second factor identified in *Wegener*, the Court does not believe Ability Insurance is "surprised" by the opinions found in the doctors' affidavits, and any prejudice to Ability Insurance may be mitigated by allowing further depositions, if needed, and time to identify a rebuttal expert.  Furthermore, allowing Dr. Salas and Dr. Shafer to testify regarding the opinions expressed in their affidavits would not "disrupt the order and efficiency of the trial."  Both doctors would be permitted to testify regarding their diagnosis and treatment of Schultz in any event.  Allowing them to testify that certain treatment (including supervised care) is consistent with accepted medical standards, and that failure to provide supervised care would have adversely affected Schultz's condition, will not disrupt the "order and efficiency" of the trial.  Finally, the Court notes that the proposed testimony is important to the merits of the case.  To meet the "medical necessity" alternative for qualifying for benefits, Schultz must prove that the care was consistent with accepted medical standards and could not have been omitted without adversely affecting her condition.  Apparently, Dr. Salas and Dr. Shafer can provide that expert testimony.

In considering all of the facts and circumstances, the Court concludes that Dr. Salas and Dr. Shafer will be permitted to testify regarding those opinions set forth in their affidavits.  To mitigate any prejudice to Ability Insurance, however, the Court finds that it should be permitted to redepose the doctors, if necessary.  Any further depositions will be limited, however, to the opinions expressed by the doctors in their affidavits.  Furthermore, Ability Insurance will be given 30 days following the entry of this Order to identify a rebuttal expert.  Ability Insurance's request for costs associated with the filing of the motion, or redeposing the doctors, is denied.

---

[7] Schultz's Response (docket number 96) at 12.

### 2.     *Statement of Additional Material Facts*

In its second motion to strike, Ability Insurance asks that the Court strike virtually all of Schultz's statement of additional facts. With comparatively few exceptions, Ability Insurance argues that the allegations are irrelevant, argumentative, without supporting citation, legal conclusions, or intentionally misleading. Attached to Ability Insurance's brief as Exhibit A is a paragraph-by-paragraph list of its specific objections.[8] As part of her response, Schultz provided a chart illustrating side-by-side the alleged additional fact, Ability Insurance's response, and Ability Insurance's objection.[9]

Initially, Schultz notes that there is no authority in the FEDERAL RULES OF CIVIL PROCEDURE for striking a party's statement of facts. FEDERAL RULE OF CIVIL PROCEDURE 12(f) authorizes a court to strike from a *pleading* any "redundant, immaterial, impertinent, or scandalous matter." A "pleading," as defined in FEDERAL RULE OF CIVIL PROCEDURE 7(a), does not include statements of fact submitted in support of, or in resistance to, a motion for summary judgment. *See United States v. Hawley*, 812 F. Supp. 2d 949, 962 n.2 (N.D. Iowa 2011) (denying a motion seeking to strike the statements of material fact offered in opposition to a motion for partial summary judgment).

In its reply, Ability Insurance asserts that its authority lies in the local rules. Ability Insurance argues that Schultz's additional statement does not contain *material* facts, nor is it "concise," as required by Local Rule 56.b. The local rules permit the striking of filings which are noncompliant.

> A failure to comply with the Local Rules may be sanctioned by the court in any appropriate manner. Sanctions may include, but are not limited to, the exclusion of evidence, the prevention of witnesses from testifying, ***the striking of pleadings or other filings***, the denial of oral argument, and the imposition of attorney fees and costs.

---

[8] *See* docket number 88-2.

[9] *See* docket number 95-6.

Local Rule 1.f (emphasis added).

While a motion to strike may be authorized by the Local Rules, the Court exercises its discretion by denying the motion. Striking a party's pleading is an extreme and disfavored measure. *BJC Health System v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007). The Court finds that Schultz's statement of additional facts is overly long, noncompliant with Local Rule 56.b, annoying, and unproductive. Nonetheless, the Court can consider the relevant facts which are adequately supported by the record, and ignore those which are irrelevant, unsupported by the record, or argumentative. *Maytag Corp. v. Electrolux Home Products, Inc.*, 448 F. Supp. 2d 1034, 1062 (N.D. Iowa 2006). It is not a productive use of the Court's time to detail 154 statements of additional material fact and specify which must be stricken, and for what reasons.[10] *See Great American Ins. Co. v. Crabtree*, 2012 WL 3656500 (D.N.M.) ("If the Court struck from the record everything it did not consider on a motion, it would spend a lot of time polishing the record."). Accordingly, Ability Insurance's motion strike Schultz's statement of additional material facts will be denied.

### B. Motion for Partial Summary Judgment

Next, Ability Insurance asks that some of Schultz's claims be summarily dismissed. Ability Insurance argues that Schultz's bad faith claim and fraud claim fail as a matter of law. It argues further that Schultz is not entitled to recover damages for emotional distress, or punitive damages.

### 1. Does the Bad Faith Claim Fail as a Matter of Law?

In her amended complaint, Schultz alleges that Ability Insurance denied her claim "without reasonable basis in fact, without proper and adequate investigation, and with

---

[10] Ability Insurance asserts in its reply, unpersuasively, that the motion to strike "is intended to save the Court time."

knowledge of the lack of reasonable basis for their denials."[11] Thus, according to Schultz, Ability Insurance has violated an obligation to engage in good faith and fair dealing, and has acted in bad faith. Ability Insurance argues that Schultz's claim was "fairly debatable," thereby precluding a recovery for bad faith.

### a. Applicable Law

In *Dolan v. Aid Insurance Co.*, 431 N.W.2d 790 (Iowa 1988), the Iowa Supreme Court recognized a tort cause of action for first-party bad faith against an insurer. *Id.* at 794. To establish its bad faith claim against Ability Insurance, Schultz is required to prove (1) Ability Insurance had no reasonable basis for denying Schultz's claim, and (2) Ability Insurance knew or had reason to know that its denial was without reasonable basis. *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005). The first element is an objective one:

> A reasonable basis exists for denial of policy benefits if the insured's claim is fairly debatable either on a matter of fact or law. A claim is "fairly debatable" when it is open to dispute on any logical basis. Stated another way, if reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable.

*Id.* (all citations omitted).

The Iowa Supreme Court has consistently stated that where a claim is "fairly debatable," the insurer is entitled to debate it. *Reuter v. State Farm Mut. Auto. Ins. Co., Inc.*, 469 N.W.2d 250, 253 (Iowa 1991). Whether a claim is fairly debatable can generally be decided as a matter of law by the court. *Bellville*, 702 N.W.2d at 473. "Courts and juries do not weigh the conflicting evidence that was before the insurer; they decide *whether evidence existed* to justify denial of the claim." *Id.* at 474 (quoting *State Farm Lloyd's, Inc. v. Polasek*, 847 S.W.2d 279, 285 (Tex. App.1992)). However, the reasonableness of a denial of benefits by an insurer is "a question of law only when the

---

[11] Amended Complaint (docket number 20) at 6, ¶ 41.

evidence is undisputed and only one inference can be drawn from the evidence." *McIlravy v. North River Ins. Co.*, 653 N.W.2d 323, 333 (Iowa 2002). In *Bellville*, the Court cited with apparent approval a treatise which explained the standard this way: "The insurer should be entitled to a directed verdict in its favor on the insured's bad faith claim unless the insured is entitled to a directed verdict in his favor on the policy claim." *Id.* (citing Stephen S. Ashley, *Bad Faith Actions Liability & Damages* § 5:04, at 5-17 to 5-18 (2d ed. 1997)).[12]

To recover on her bad faith claim, Schultz must also prove the second element, which is subjective:

> Even when the insurer lacks a reasonable basis for its denial of a claim, liability for bad faith will not attach unless the insurer knew or should have known that the basis for denying its insured's claim was unreasonable.

*Bellville*, 702 N.W.2d at 474.

An insurer's "sub-par" investigation or evaluation is relevant to a determination of whether it should have known its denial lacked a reasonable basis. *Id.* However, "an improper investigation, standing alone, is not sufficient cause for recovery if the insurer in fact has an objectively reasonable basis for denying the claim." *Id.* (quoting *Reuter*, 469 N.W.2d at 254-55).

### b. Relevant Facts

---

[12] It should be noted, however, that the federal courts in Iowa have consistently held that *Bellville* did not expressly adopt the "directed verdict rule." *See Zimmer v. Travelers Ins. Co.*, 454 F. Supp. 2d 839, 864-65 (S.D. Iowa 2006) (C.J. Pratt, presiding); *Etten v. U.S. Food Service, Inc.*, 446 F. Supp. 2d 968, 975 n.5 (N.D. Iowa 2006) (J. Reade, presiding); *Niver v. Travelers Indem. Co. of Illinois*, 412 F. Supp. 2d 966, 978-79 (N.D. Iowa 2006) (C.J. Bennett, presiding). The cases note that in *Reuter*, the Iowa Supreme Court stated that "[w]e do not agree that the mere denial of a plaintiff's motion for a directed verdict automatically establishes that the issue is 'fairly debatable.'" 469 N.W.2d at 254. *Bellville* did not expressly overrule *Reuter* on that issue.

In the summer of 2007, Schultz visited the emergency room, suffering from diverticulitis. She was subsequently seen by Dr. Salas in his office on July 13, 2007. Family members who accompanied her on that day expressed concerns about her decreased appetite and "her ability to care for herself at home." Her family had discussed putting her into an assisted-living facility, but she was "somewhat resistant to this." In his office note, Dr. Salas observed that she has been "able to continue volunteering at the Finley Hospital with no difficulties."[13] After a lengthy discussion with Schultz's family, it was decided to pursue a psychiatric evaluation through Dr. Shafer for possible depression, with "followup" in the fall.

On October 4, 2007, Schultz drove to Dr. Shafer's office for an examination. At that time, Schultz admitted "short-term memory deficit" and increased weakness in her lower extremities, "making it difficult" for her to return to her volunteer work at the hospital. In his progress note, Dr. Shafer observed that when Schultz was in the hospital recently, her daughter was concerned that "she was no longer functioning well at home and was insisting that she may have to go into a nursing facility and give up her driving."[14] Dr. Shafer also noted, however, that Schultz was seeing Dr. Salas and Dr. Martin, "both of whom have given her a fairly clean bill of health and felt that she was not ready to move out of her home yet or to give up driving." Upon examination, Schultz demonstrated some short-term memory deficits, and Dr. Shafer diagnosed her with "major to mild cognitive impairment."

Dr. Shafer saw Schultz again in February 2008, and conducted a mini-mental state examination (MMSE). Schultz scored 27 out of 30, with 27 or above considered normal. At that time, Schultz was continuing to volunteer at the hospital on a regular basis. According to Dr. Shafer's progress note for that visit, the test results suggested "some

---

[13] AIC MSJ App. 040.

[14] AIC MSJ App. 046.

mild memory impairment, either in the range of age related memory impairment or mild cognitive impairment."[15] Dr. Shafer recommended follow up in six months.

### (1) First Claim.

On August 16, 2008, Schultz was admitted to the Dubuque Retirement Community, an assisted living facility. At that time, Dr. Salas completed an "Attending Physician's Statement."[16] According to the statement, Dr. Salas last saw Schultz on May 29, 2008. When asked if certain services were "necessary," Dr. Salas checked "RN," "Certified Aid," and "Homemaker." According to Dr. Salas, Schultz was able to perform "completely independently" the following activities of daily living (ADLs): bathing, transferring, toileting, and dressing.[17] Schultz required "cueing or supervision of another person," however, for "continence bladder/bowel" and eating. In his statement, Dr. Salas opined that Schultz was expected to require 4-6 hours of care per day, seven days per week, for twenty-four months, "subject to reconsideration." Importantly, Dr. Salas also stated that Schultz was not capable of returning to her prior level of independence with rehabilitation, due to "progressive dementia." Similarly, the "negotiated service plan" entered into between Schultz and the nursing facility indicated that Schultz was "independent" with bathing, toileting, dressing, dining, and mobility.[18]

On August 6, 2008, shortly before entering the Dubuque Retirement Community, Schultz submitted an application for benefits under the long-term care policy. The "proof of loss" signed by Schultz states that she needs assistance with eating and "other."[19] In

---

[15] AIC MSJ App. 051.

[16] AIC MSJ App. 032.

[17] It should be noted, however, that "bathing" is not one of the five "activities of daily living" defined in the policy.

[18] AIC MSJ App. 058-060.

[19] AIC MSJ App. 077-078. The proof of loss form provided by Medico Life
(continued...)

response, Brenda K. Stastny, an employee in the claims service department at Medico Life Insurance Company, sent a letter to Dr. Salas, dated August 26, 2008, seeking records regarding Schultz's treatment and diagnosis, and completion of a Cognitive Evaluation.[20] Dr. Salas completed a two-page Evaluation of Cognitive Impairment on September 9, 2008.[21] Dr. Salas noted that Schultz scored 27 out of 30 on the MMSE. Dr. Salas also opined, however, that Schultz's cognitive deficits "cause significant impairment in social or occupational functioning and represent a significant decline from a previous level of functioning." Furthermore, Dr. Salas' evaluation indicates that "[t]he course of the cognitive deficit is characterized by gradual onset and continuing cognitive decline." Finally, Dr. Salas states that Schultz's primary diagnosis, which was initially made in October 2007, is dementia.

The Medico claims department also received a "Facility Certification of Care" from the wellness director at the Dubuque Retirement Community.[22] The Certification of Care states that Schultz is able to perform independently the ADLs of transferring, continence bladder/bowel, eating, and toileting. According to the Certification of Care, however, Schultz needed "cueing or supervision" for dressing and bathing.

A Benefit Determination Assessment was also conducted at Medico's request by LifePlans.[23] An MMSE performed by the LifePlans assessor resulted in a score of 24. Information provided by Schultz's son, Robert, suggested that Schultz gets lost outside her home and has memory loss. According to the LifePlans assessment, Schultz was

---

[19] (...continued)
Insurance Company included "bathing" as an "activity of daily living."

[20] AIC MSJ App. 287.

[21] AIC MSJ App. 033-034.

[22] AIC MSJ App. 083.

[23] AIC MSJ App. 093-119.

independent in bathing, transferring, dressing, and continence, but requires cueing to meal times. When asked on the form about the "expected outcome for the insured," the assessor checked "deterioration." The claim was denied on October 24, 2008.[24]

### (2) Second Claim.

On April 9, 2009, Robert Schultz, acting as power of attorney for Plaintiff Phyllis Schultz, filed a second proof of loss, seeking benefits under the policy.[25] On May 26, 2009, Medico Life Insurance Company requested additional information from the Dubuque Retirement Community.[26] The responsive documents included a "Nursing Comprehensive Evaluation," dated March 31, 2009.[27] The evaluation states that Schultz is independent in the ADLs of eating, toileting, transferring, ambulation, dressing, hygiene, and bathing. The form is checked yes for "memory impaired," but is checked no for "dementia." An MMSE resulted in a score of 23, reflecting a continued downward trend for Schultz. On a "global deterioration scale" the nurse checked "mild cognitive decline." A "fall risk assessment" stated that Schultz suffers from "intermittent confusion" and scored as a "high risk" of fall.

As part of the claim examination, a second "Benefit Determination Assessment" was conducted by LifePlans, Inc.[28] The report states that Schultz had fallen three times in the last six months. An MMSE conducted on June 4, 2009 resulted in a score of 15. When asked, Schultz responded incorrectly to the year, month, and date. She made no response to the season or the day of the week. Schultz also did not respond when asked what town, county, and state she was in. (It should be noted, however, that an MMSE

---

[24] AIC MSJ App. 125.

[25] AIC MSJ App. 128-131.

[26] AIC MSJ App. 133.

[27] AIC MSJ App. 142-152.

[28] AIC MSJ App. 155-178.

conducted by the facility on July 23, 2009 resulted in a score of 22.[29]) According to the assessment, Schultz needed cueing for bathing and dressing, but remained independent for transferring and eating. Schultz was independent regarding bladder continence, but needed "hands on assistance" regarding bowel continence. The assessor opined that Schultz's "expected outcome" was "deterioration." The second claim for benefits was denied on August 12, 2009.[30]

### (3)    Claims Processing

As part of the due diligence in purchasing the Medico Life Insurance Company, LifePlans, Inc. conducted an audit of its claims processing. The report was critical of the processes and suggested that "[t]he implementation of LifePlans claims protocols will eliminate the liability associated with ineligible individuals, reduce the liability by 30% for those who could be treated in lower cost alternatives, and reduce it by 15% by those who require lower intensity of care."[31] Contracts which have three methods to qualify for benefits, such as the policy in this case, are known in the industry as having a "triple trigger." According to the LifePlans Claims Audit, "[t]he Medical Necessity trigger is considered the most generous in terms of benefit eligibility and the most onerous in terms of benefit management."[32] The report opines that "the definition of what constitutes medical necessity, where such medical care ought to be received, and when a medical necessity diminishes, is almost never well defined."[33] LifePlans advises that "an industry-wide *best practice* and strategy of particular importance" is maintaining a distinction

---

[29] AIC MSJ App. 190.

[30] AIC MSJ App. 198.

[31] PLTF Resp MSJ APP 000510.

[32] PLTF Resp MSJ APP 000512.

[33] *Id.*

between the "benefit eligibility certification provider" and the "service provider."[34] Accordingly, LifePlans discouraged claims examiners from having contact with service providers.

> [A] Claims Examiner should not look to physicians or healthcare providers providing services to the insured, to provide information to support the benefit eligibility determination. The benefit eligibility determination should be based upon an objective assessment of the functional and/or cognitive ability of the insured. Service providers and physicians cannot be expected to operate in an objective fashion. Further, they do not understand the contract definitions or subtle differences in the nature of various contracts. Nor are they typically expert in measuring the extent of ADL loss. By definition, the nature of the relationship between a LTC service provider and a recipient for services creates a potential conflict of interest for the service provider; thus, the information gathered from these sources may not be objective and empirical information necessary to determine benefit eligibility.

Medico Insurance Group Claims Due Diligence at 14, PLTF Resp MSJ APP 000514.

Anne Ingoldsby, who was employed by LifePlans when the claims audit was prepared, was hired by Ability Resources, Inc. to oversee its case management department.[35] Don Charsky, who is president and CEO of Ability Resources Holdings – the parent company of both Ability Insurance and Ability Resources – was formerly the president and CEO of LifePlans, Inc.

    *c.    Analysis*

To be eligible for benefits under the long-term care policy, Schultz must meet at least one of three benefit qualifiers: medical necessity, loss of functional capacity, or cognitive impairment. Ability Insurance argues that Schultz did not qualify for benefits

---

[34] PLTF Resp MSJ APP 000514.

[35] It should be recalled that Ability Insurance has a contract with Ability Resources, Inc. to perform its administrative functions, including claims management.

under any of the three alternatives and, at best, her claim was "fairly debatable," thereby precluding a recovery for bad faith.

### (1)   *Loss of Functional Capacity*

To be eligible for benefits due to "loss of functional capacity," Schultz must need "active personal assistance to perform at least two of the five defined Activities of Daily Living."[36]   The "activities of daily living" are defined as eating, dressing, toileting, transferring, and continence.  Under the terms of the policy, an insured is considered to be in need of assistance for these activities when they cannot, "without the aid of another person," appropriately engage in those activities.[37]   Here, the Negotiated Service Plan executed when Schultz was initially admitted to the Dubuque Retirement Community stated that Schultz was "independent with dining," "able to independently complete dressing/undressing/grooming tasks," "independent with toileting," "independent with all aspects of mobility,"  and there is no indication that she needed assistance regarding "continence."[38]   In other words, the Negotiated Service Plan did not reflect that Schultz needed assistance on any of the activities of daily living described in the policy.[39]   The attending physician's statement signed by Dr. Salas at that time indicated Schultz "performs completely independently" dressing, toileting, and transferring.  Dr. Salas reported, however, that Schultz was able to complete eating and continence only with "cueing or supervision of another person."[40]   The "Facility Certification of Care," prepared by the wellness director at the Dubuque Retirement Community on September

---

[36] AIC MSJ App. 021.

[37] AIC MSJ App. 018.

[38] AIC MSJ App. 059-060.

[39] The "assessment summary" states, however, that Schultz needed "reminders" on dressing and grooming.  AIC MSJ App. 063.

[40] AIC MSJ App. 032.

3, 2008, stated that Schultz "performs completely independently" the ADLs of eating, toileting, transferring, and continence. The report indicated, however, that Schultz needed "cueing or supervision" with dressing/undressing/grooming.[41] A Benefit Determination Assessment by LifePlans suggested that Schultz was independent with eating, dressing, toileting, transferring, and continence.[42]

In summary, the information provided to Ability Insurance in the summer of 2008 was conflicting on her need for assistance on the activities of daily living. Dr. Salas stated that Schultz needed "cueing or supervision" on the ADLs of eating and continence. The reports from the Dubuque Retirement Community and LifePlans suggested, however, that Schultz was independent in that regard. On the other hand, the reports submitted by the Dubuque Retirement Community suggested that Schultz needed cueing or supervision with dressing/undressing/grooming. Dr. Salas' statement and the LifePlans assessment indicated that Schultz was independent in that regard. Even when the evidence is viewed in the light most favorable to Schultz, the Court believes that reasonable minds could differ regarding whether she qualified for benefits under the "loss of functional capacity" alternative when the first claim was filed in 2008.

When the second claim was filed in April 2009, Ability Insurance was provided with a "Nursing Comprehensive Evaluation" prepared on March 31, 2009. The reported stated that Schultz was independent in the ADLs of eating, toileting, transferring, ambulation, and dressing. The LifePlans assessment stated that Schultz needed verbal guidance or cueing regarding eating and dressing, but was independent regarding transferring. Schultz needed hands-on assistance regarding bowel continence, but was independent regarding bladder continence. Again, the Court concludes that Ability

---

[41] AIC MSJ App. 084.

[42] AIC MSJ App. 107-111.

Insurance's denial of Schultz's claim under the "loss of functional capacity" alternative was fairly debatable, thereby precluding a recovery for bad faith.

To recover under this alternative, Schultz must demonstrate a need for "active personal assistance" in performing at least two of the five defined activities of daily living. It appears clear that Schultz needed "active personal assistance" with respect to bowel continence. It is disputed regarding whether she needed *any* assistance for eating or dressing. At best, she may have needed "cueing" for those activities. Ability Insurance asserts that "cueing or supervision" does not constitute "active personal assistance," as required by the policy. Because there are matters of fact and law which are fairly debatable, Ability Insurance cannot be found in bad faith for refusing to pay benefits under this alternative.

### (2) Cognitive Impairment

Schultz was entitled to recover under the "cognitive impairment" alternative if she required "supervision and direction because of cognitive impairment."[43] Cognitive impairment is defined in the policy as a deterioration or loss in intellectual capacity, "which requires continual supervision to protect yourself or others."[44]

The Negotiated Service Plan executed when Schultz entered the Dubuque Retirement Community stated that she "is alert and oriented and able to make her needs known."[45] In his Attending Physician's Statement, Dr. Salas states that Schultz will not be capable of returning to her prior level of independence with rehabilitation, due to "progressive dementia."[46] However, the "Evaluation of Cognitive Impairment" signed by Dr. Salas on September 9, 2008, reflects a score on the MMSE of 27 out of 30, which

[43] AIC MSJ App. 021.

[44] AIC MSJ App. 019.

[45] AIC MSJ App. 059.

[46] AIC MSJ App. 032.

is considered normal. Dr. Salas identified a "disturbance in executive functioning," and indicated that the deficit would "cause significant impairment in social or occupational functioning and represent a significant decline from a previous level of functioning." Dr. Salas diagnosed Schultz with "primary degenerative dementia."[47] In his Attending Physician's Statement, Dr. Salas states that Schultz will require 4-6 hours of care per day, 7 days per week. Ability Insurance asserts, however, that this is not "continual supervision," as required by the policy. Because the meaning of "continual supervision" is fairly debatable, the Court concludes that Ability Insurance cannot be found in bad faith for denying Schultz's first claim for benefits on this alternative.

Schultz's condition had deteriorated, however, by the time the second claim was filed in April 2009. The MMSE performed on March 31, 2009 resulted in a score of 23. When tested by a LifePlans assessor, however, Schultz scored only 15. According to the report, Schultz has "good" and "bad" days, and "today was a good day." The assessor concluded that Schultz's condition was likely to deteriorate. Schultz had fallen three times in the last six months and, in part because of her confusion, she remained a high risk of fall. At that point, the issue of whether Schultz's eligibility for benefits remained "fairly debatable" becomes a much closer call.

### (3)     *Medical Necessity*

Schultz may also qualify for benefits if her care in the facility was "consistent with accepted medical standards" for treating her condition, and the care "could not have been omitted without adversely affecting" her condition.[48] In affidavits filed in resistance to the instant motion for partial summary, Dr. Salas and Dr. Shafer opine that Schultz's admission to the facility in August 2008 met both of the policy requirements.

---

[47] AIC MSJ App. 034.

[48] AIC MSJ App. 021.

Ability Insurance argues that the information submitted with the proof of loss did not indicate that Schultz was receiving any particular treatment at the facility. The Negotiated Service Plan and the Facility Certification of Care do not alert Ability Insurance to any issues relating to dementia, or any other condition requiring placement at the facility. However, the Attending Physician's Statement signed by Dr. Salas on August 19, 2008 alerted Ability Insurance that Schultz would not be capable of returning to her prior level of independence because of progressive dementia.[49] Dr. Salas subsequently signed an Evaluation of Cognitive Impairment on September 9, 2008, indicating that Schultz's primary diagnosis was dementia, which "is characterized by gradual onset and continuing cognitive decline."[50]

When considering a motion for summary judgment, the Court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006). When viewed in that light, Ability Insurance had reliable information from a treating physician that Schultz suffered from progressive dementia, which would result in a continuing cognitive decline, and she would not be capable of returning to her prior level of independence. That is, there was credible evidence that Schultz required placement at the facility due to progressive dementia. Ability Insurance chose to ignore that evidence, however, and focus instead on those facts which supported their conclusion that Schultz did not qualify for benefits under the other policy alternatives. It must be recalled that in order to recover benefits, Schultz must only prove eligibility under one of the three alternatives. That is, even if Schultz's claims under the loss of functional capacity and cognitive impairment alternatives were fairly debatable, Ability Insurance

---

[49] AIC MSJ App. 032.

[50] AIC MSJ App. 033-034.

may be liable for bad faith if there was "no reasonable basis" for denying Schultz's claim under the medical necessity alternative.

Ability Insurance asks that the Court find, as a matter of law, that Schultz's entitlement to benefits was "fairly debatable." While there may be no dispute regarding the documentation submitted by Schultz in support of her claim, the Court concludes that the inferences which may be drawn from that evidence are disputed. In *McIlravy*, the insurer initially denied the claim based on information provided, but then received additional information in a deposition. The Court in *McIlravy* concluded that "[a]lthough the new information provided in the deposition did not necessarily render the compensability issue undebatable, it did transform the reasonableness of the continued denial by North River into a jury question." 653 N.W.2d at 333. A reasonable inference to be drawn from Dr. Salas' physician statement and cognitive evaluation – when viewed in the light most favorable to Schultz – is that Schultz required placement at the facility to treat her progressive dementia. I conclude here that a jury must decide whether Ability Insurance "had no reasonable basis" for denying Schultz's claim. *Bellville*, 702 N.W.2d at 473. Similarly, whether Ability Insurance knew or should have known that its basis for denying Schultz's claim was unreasonable is also an issue for the jury. *Id.* at 474.

## 2. Does the Fraud and Misrepresentation Claim Fail As a Matter of Law?

Schultz claims in her amended complaint that in its response to her claim for benefits, Ability Insurance "misrepresented eligibility requirements under the policy of insurance and withheld material information that would have allowed her to rebut their claim denials."[51] Schultz asserts that she relied to her detriment on the misrepresentations, and that the misrepresentations were "purposefully calculated" to take advantage of elderly claimants.

Ability Insurance first argues that Schultz's amended complaint fails to meet the "particularity" requirement contained in the rules. FEDERAL RULE OF CIVIL PROCEDURE

---

[51] Amended Complaint (docket number 20) at 6, ¶ 43.

9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." That is, the plaintiff must plead "the who, what, when, where, and how." *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011). "Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Drobnaki v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (quoting *Schaller Tel. Co. v. Golden Sky Sys., Inc.*, 298 F.3d 736, 746 (8th Cir. 2002)).

The allegations contained in Schultz's amended complaint are vague and conclusory. Schultz fails to provide any detail regarding the alleged misrepresentations or omissions. The bare-bones allegations contained in Schultz's third claim for relief do not meet the heightened pleading standard found in Rule 9(b). *Summerhill*, 637 F.3d at 880. Accordingly, the claim may be dismissed for that reason.

Even if the fraud claim is considered on its merits, however, the Court finds that it is subject to summary judgment. In Iowa, there are eight elements to a claim for fraudulent misrepresentation.

> (1) the defendant made a representation to the plaintiff, (2) the representation was false, (3) the representation was material, (4) the defendant knew the representation was false, (5) the defendant intended to deceive the plaintiff, (6) the plaintiff acted in justifiable reliance on the truth of the representation, (7) the representation was a proximate cause of the plaintiff's damages, and (8) the amount of damages.

*Spreitzer v. Hawkeye State Bank*, 779 N.W.2d 726 (Iowa 2009). A representation need not be an affirmative misstatement, however, "the concealment of or failure to disclose a material fact can constitute fraud." *Clark v. McDaniel*, 546 N.W.2d 590, 592 (Iowa 1996).

While the amended complaint refers generally to "misrepresented and omitted information," Schultz clarifies in her brief that "the fraud claim here is based on material

omissions."[52] Specifically, Schultz asserts that Ability Insurance failed to disclose "the fact that it secretly applies highly restrictive eligibility requirements that do not appear anywhere in the policy." Ability Insurance argues that this allegation is "a mere repackaging" of Schultz's breach of contract claim. The Court agrees.

Schultz appears to combine her breach of contract claim with her bad faith claim, and call it fraud. Ability Insurance's refusal to pay benefits – even if ultimately determined to be a breach of contract – does not give rise to a claim for fraud. *City of McGregor v. Janett*, 546 N.W.2d 616, 619 (Iowa 1996) ("Mere failure of future performance cannot alone prove deceit; otherwise every breach of contract would give rise to an action for fraud."). The amended complaint alleges that Ability Insurance "misrepresented eligibility requirements" when responding to Schultz's claim for benefits, and "withheld material information" that would have allowed her to respond. Schultz makes no effort, however, to identify what eligibility requirements were misrepresented or what material information was withheld. Not only do the allegations in the amended complaint lack particularity, Schultz's brief and appendix in response to the instant motion provide no evidence to support the allegations. "Evidence, not contentions, avoids summary judgment." *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel West Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The Court concludes that Ability Insurance is entitled to summary dismissal of Schultz's fraud claim.

### 3. May Schultz Recover Damages for Emotional Distress?

Next, Ability Insurance argues that it is entitled to summary judgment on Schultz's request for emotional distress damages. Normally, damages for emotional distress are not recoverable incident to a breach of contract. *Bossuyt v. Osage Farmers Nat. Bank*, 360 N.W.2d 769, 777 (Iowa 1985). There are, however, two exceptions: first, where the emotional distress accompanies a bodily injury; and second, where "the contract or the

---

[52] Schultz's Response (docket number 78) at 16.

breach is of such a kind that serious emotional disturbance was a particularly likely result."
*Id.* (quoting Restatement (Second) of Contracts § 353, Comment *a* (1981)). Even if a
breach of contract results in "sudden impoverishment or bankruptcy," thereby causing
severe emotional disturbance, no recovery can be made for the emotional distress "if the
contract is not one where this was a particularly likely risk." *Id.* at 777-78. The Court
concludes that Schultz is not entitled to recover damages for emotional distress, if any,
caused by Ability Insurance's breach of contract, if any. *See also Clark-Peterson Co.,
Inc. v. Independent Ins. Associates, Ltd.*, 514 N.W.2d 912, 916 (Iowa 1994) (finding the
plaintiffs were not entitled to recover for "ordinary emotional distress" when the alleged
breach of contract was not "particularly likely to cause emotional disturbance").

In this case, however, the Court has denied Ability Insurance's motion to summarily
dismiss Schultz's bad faith claim. Accordingly, it must decide whether Schultz may
recover for emotional distress, if any, suffered as a result of Ability Insurance's bad faith,
if any. In *Nassen v. National States Ins. Co.*, 494 N.W.2d 231 (Iowa 1992), the plaintiff
purchased nursing home insurance from the defendant. When the defendant subsequently
denied her claim for benefits, she sued for breach of contract and bad faith. The jury
awarded actual damages totaling $123,000 and punitive damages of $500,000. The Iowa
Supreme Court affirmed, finding that there was sufficient evidence to support an award
of damages for emotional distress on the bad-faith claim. *Id.* at 237.

> It is, of course, difficult to arrive at a sum of money that fairly
> compensates for the trauma visited upon elderly persons by
> having their worldly possessions dissipated by extended care
> costs that they believe should be covered by insurance. We
> are convinced, however, that this is a situation capable of
> producing severe mental suffering.

*Id.* at 238. While the evidence produced regarding Schultz's alleged emotional distress is
limited, the Court concludes it goes to the *amount* to be awarded by the jury, if any, rather
than the issue of whether emotional distress damages are recoverable. In its reply, Ability
Insurance argues that the emotional distress must be "severe or extreme" to be

recoverable. The cases cited by Ability Insurance in support of its argument, however, involve claims of intentional infliction of emotional distress. Schultz does not make that claim here. In first recognizing a cause of action for first-party bad faith against an insurer, the Court in *Dolan* was "convinced traditional damages for breach of contract will not always adequately compensate an insured for an insurer's bad faith conduct." 431 N.W.2d at 794. The Court further concluded that "we do not believe the availability to the insured of extra-contractual damages should be dependent upon the insured sustaining severe emotional distress occasioned by the insurer's conduct." *Id.* That is, the Court concluded that an action for intentional infliction of emotional distress "does not provide an adequate remedy due to its limited applicability." *Id.* Therefore, it is clear that a plaintiff proving bad faith may recover emotional distress damages without a requirement that they be "severe or extreme." *If* a jury concludes that Ability Insurance acted in bad faith in refusing to pay Schultz's claim, then it may consider whether Schultz suffered any emotional distress as a consequence of that bad faith.

### 4. May Schultz Recover Punitive Damages?

Ability Insurance argues that because it is entitled to summary judgment on Schultz's bad faith and fraud claims, the Court must also dismiss Schultz's request for punitive damages, citing *Magnusson Agency v. Public Entity Nat. Company-Midwest*, 560 N.W.2d 20, 29 (Iowa 1997) ("Generally, a breach of contract, even if intentional, is insufficient to support a punitive damage award."). As set forth above, however, the Court has concluded that Schultz's bad faith claim must be decided by the jury. *If* a jury concludes that Ability Insurance had no reasonable basis for denying Schultz's claim, and it knew or should have known that its denial was without a reasonable basis, then punitive damages may be awarded if Ability Insurance's actions meet the standards of Iowa Code section 668A.1. *Id.* Accordingly, Ability Insurance is not entitled to summary judgment on this issue.

## V. ORDER

IT IS THEREFORE ORDERED as follows:

1.     Defendant's Motion to Strike Certain Testimony (docket number 85) is **GRANTED** in part and **DENIED** in part. The Court will not strike the affidavits of Dr. Salas and Dr. Shafer. However, Ability Insurance may redepose the doctors, if necessary, regarding the opinions expressed in their affidavits. Furthermore, Ability Insurance may identify a rebuttal expert not later than thirty (30) days following the entry of this Order.

2.     Defendant's Motion to Strike Plaintiff's Statement of Additional Material Facts (docket number 88) is **DENIED**.

3.     Defendant's Motion for Partial Summary Judgment (docket number 66) is **GRANTED** in part and **DENIED** in part. Plaintiff's third claim for relief – fraud and misrepresentation – is dismissed. In all other respects, the motion for partial summary judgment is denied.

DATED this 25th day of October, 2012.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA